FRED W. JONES, Jr., Judge.
After a jury trial, the defendant Wright was found guilty of five counts of armed robbery (R.S. 14:64). He was sentenced to serve five prison terms of 99 years each, without benefit of parole, to run consecutively, except for the two counts involving the same store robbery, which were to be served concurrently with each other, and consecutively to the other sentences.
The defendant appealed, reserving three assignments of error, raising the issues to be discussed hereinafter.

Factual Context

On October 25, 1986 at 10:00 a.m. the defendant was driving his sister’s red Mustang through Monroe. The passengers, Brown, Ambers and Singleton discussed robbing a store. The defendant instructed Singleton to obtain a gas can, which Singleton found at a relative’s house. After dropping Ambers off, the remaining three occupants of the car approached a Gas Way Service Station where the defendant determined there was only one attendant present. The defendant provided a .22 caliber pistol and remained in the automobile. Brown and Singleton took the gas can and *767 walked toward the service station, as though they needed to purchase gas.
The two entered the store and paid for gasoline to be put in the can. When the attendant opened the register, one produced the gun furnished by the defendant and obtained the money in the cash register. After leaving the store on foot, the two were picked up by the defendant, driving his sister’s car.
On November 1, 1986, at approximately 10:00 p.m., Ambers and Brown robbed the Delta Mini-Mart on South Second Street in Monroe, where there were two attendants present. They had been transported by defendant, driving the red Mustang, who parked a block away from the store. Again, defendant provided Ambers with the pistol used in the robbery. After parking the vehicle, defendant got out and walked to a lot across from the Mini-Mart. When Ambers and Brown came out of the store after the robbery, defendant threw the car keys to Ambers who ran to the automobile, turned it around, and drove it to pick up defendant. They then returned to defendant’s house.
Next, driving Ambers in the red Mustang, defendant selected the Junior Food Mart on 7th Street, a block or so from the Monroe Civic Center. Defendant provided Ambers with a weapon and dropped him off, parking a block away. After Ambers robbed the food mart, he left the store but could not find defendant. Ambers ran to the parking lot of the Monroe Civic Center and found the red Mustang with the keys in it. He jumped in, drove away, stopped for a beer, and returned to defendant’s house.
The red Mustang was unavailable on November 3, 1986, but Singleton provided a gold Nova for him, Ambers and defendant. They stopped at the Liquor Bam, where Ambers went in and then returned to report to his companions that there was only one attendant present. Defendant handed Ambers the pistol used in the other robberies. Singleton drove the car around the back of the store and parked it. Ambers and defendant walked back to the Liquor Bam. Defendant waited outside while Am-bers entered and asked for change for a $10 bill. When the attendant opened the cash register, Ambers demanded all the money and told her that the man standing outside also had a gun. After the robbery, the two left on foot to walk past a drugstore, jumped into the car, and Singleton drove away.
The suspicious appearance of the Nova, without its lights on, pulling behind the Liquor Barn and parking while two males exited, aroused the attention of a train engineer going down the track behind the store at about 4 miles per hour. He was able to provide the police with a description of the car and a partial license plate number.
The suspects were stopped for a traffic violation (a broken taillight) some three miles from the Liquor Bam. The car matched the description provided by the train engineer. Each occupant was searched and cash found in his possession. The jackets worn by the defendant and Ambers, along with the pistol, a cap and two stockings were seized. Later, an officer found $265 stuffed down between the seats in the patrol car that transported defendant.
The parties were arrested and these charges filed.
Evidence of “Other Crimes”
Defendant contends the trial judge erred in failing to declare a mistrial when the prosecutor elicited evidence of “other crimes” during his interrogation of the witness, Brown. The latter stated that, after one of the robberies, Ambers gave the money to defendant who bought some cocaine with it.
According to La.C.Cr.P. Article 770, upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during trial or in argument, refers directly or indirectly to: ... “2) another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;”. Also see State v. Prieur, 277 So.2d 126 (La.1973).
*768 Although the witness who made the statement was not a court official, because the answer was responsive to the question and the prosecutor knew what the answer would be and obviously intended to have the information placed before the jury, the remark is attributed to the district attorney. See State v. Cummings, 303 So.2d 725 (La.1974)
In this case, however, because references had been made and evidence had been admitted several times, without objection, to defendant’s involvement in “other crimes”, we do not deem this to have been reversible error. Those occasions were as follows:
1) In his opening statement, defense counsel asserted: “Johnny Ambers had given Lester Carl Wright $700 and Lester Carl Wright was supposed to go and find some cocaine to buy with [sic] Johnny Ambers ... had raised $700 together to give to Lester Wright for him to go and find some cocaine to buy for them. Instead of buying the cocaine with the $700, Lester Wright ... spent it ...”
2) Under cross-examination (R 60), a witness admitted he had told defense counsel that defendant had beaten Am-bers out of $700 relating to the purchase of cocaine.
3) In a joint exhibit filed to explain the context of an alleged prior inconsistent statement, the witness Brown asserted that defendant was “going to buy some, some coke” with the money stolen during the robbery.
4) On another occasion the prosecutor was asking the witness Ambers about his use of cocaine and source of supply. Ambers replied that “Wright always bought it.”
Consequently, before the prosecutor elicited from the witness Brown testimony concerning the purchase of cocaine, the jury had already heard on several occasions of defendant’s involvement in drug offenses.
The rationale for excluding evidence of “other crimes”, except for limited exceptions, from consideration by the jury is to prevent that body from concluding, because defendant was a “bad man”, that he more than likely committed the crime for which he was being tried. Here the jury had already heard that evidence, not only from the state, without objection, but also from defense counsel.
In State v. Williams, 271 So.2d 857 (La.1973), the court held the defense had no basis for objecting to the introduction into evidence of exhibits previously not objected to. Also see State v. Eastin, 419 So.2d 933 (La.1982); State v. Carvin, 308 So.2d 757 (La.1975); State v. Roberson, 454 So.2d 343 (La.App. 4th Cir.1984).
This assignment is without merit.

Right to Remain Silent

In this assignment, defendant contends the prosecutor made an impermissible reference to his exercise of his right to remain silent in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). This case held that the use for impeachment purposes of a defendant’s silence, after receipt of Miranda warnings, is a violation of the due process clause of the 14th amendment.
Here the defendant took the stand and testified that he was not a robber — he sold drugs for a living and did not need to rob. In fact, he tried to keep a “clean” record so he could be free to sell his drugs. He claimed that he intended to report Ambers as a robber to Deputy Moore shortly after Moore left his card with a message for him to call at the Jackson Bar.
Wright testified that after he was apprehended, Moore asked him what had happened and he told Moore that he had not thought Ambrose (his name for Ambers) had done the West Monroe robbery earlier but now he believed Ambrose had. On cross examination, Wright also claimed that he had told Deputy Moore that Am-bers had committed the Junior Food Mart robbery.
The next witness called by the defendant was Deputy Moore. Moore testified that Wright had offered to cooperate when he was being transported in his unit to the Liquor Barn just after he was apprehended. According to Moore, Wright did not mention the West Monroe robbery *769 but did tell him the other two subjects were involved in the “other stores”. He related Wright’s offer to “work with” him to the city police, but they “put him off.”
On cross examination, the prosecutor attempted to clarify exactly what Wright had told Moore. Deputy Moore admitted that other than during the ride from the initial stop to the Liquor Barn, Wright had not attempted to tell him anything although inmates were allowed to talk to police officers. At this point, defense counsel objected and claimed that this line of questioning was an improper reference to Wright’s remaining silent.
The defendant testified that he kept a “clean” record — other than his business of selling drugs. In fact, he made much of the fact that he was willing to cooperate with the police to apprehend the real robbers .... the defendant called Deputy Moore to the stand to corroborate his claim. When the State questioned Deputy Moore to find out just how hard Wright had attempted to cooperate, the defense claimed a violation of defendant’s constitutional right to remain silent. This simply is not the case. The defendant raised the issue of whether or not he cooperated with the police as a part of his defense. The state was entitled to refute this contention.
The testimony in question was not intended as a comment on defendant’s exercise of his right to remain silent, but was elicited to rebut the assertion that defendant was prevented from talking to Deputy Moore.
This assignment lacks merit.

Use of Perjured Testimony

Defendant argues his convictions should be reversed because the state relied upon testimony of Ambers and Brown which it knew was inconsistent with prior statements, citing U.S. ex rel Washington v. Vincent, 525 F.2d 262 (2d Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). In that case the prosecutor allowed a witness to testify that no “deal” had been made for his testimony when, in fact, the prosecutor had agreed to “help him in his case.” After the witness testified, the prosecutor dismissed charges pending against him.
Here, not only the prosecutor knew of prior inconsistent statements, but defense counsel also was aware of those statements, having copies of the statements with which he could impeach the witnesses. Therefore, the state did not enjoy any unfair advantage.
This assignment is without merit.

Excessive Sentence

Defendant contends that the sentences imposed are unconstitutionally excessive.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C. Cr.P. Article 894.1. The trial judge is not required to list every aggravating or mitigating circumstance as long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The articulation of the factual basis for a sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with Article 894.1. State v. Landos, 419 So.2d 475 (La.1982). The important elements which must be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981).
Here, the trial judge noted that the 32 year old defendant had a juvenile record and an extensive misdemeanor record. His work record was sporadic and he admitting to dealing in cocaine and using drugs. After his first felony conviction, the defendant was placed on probation but apparently not rehabilitated. In this case he was found guilty of five counts of armed robbery occurring within a three week period. He provided the weapon, transportation or lookout during these robberies. The poten *770 tial for death or great bodily harm was present on each occasion.
We find that the trial judge adequately complied with Article 894.1.
Next, we must determine whether the sentences imposed are too severe given the circumstances of the case and the background of the defendant. A sentence violates La.Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). However, a trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983).
As a general rule, maximum sentences are to be reserved for the most egregious and blameworthy of offenders within a class. State v. Telsee, 425 So.2d 1251 (La. 1983). Addressing the question of the imposition of the maximum sentence for armed robbery, our supreme court remarked in State v. Douglas, 389 So.2d 1263 (La.1980):
“This court does not lightly consider the matter of a 99-year sentence imposed without hope of release on parole. There may be sound arguments against the frequent use of such sentences, but these arguments address themselves to the reasoned discretion of the sentencing judge. The function of the reviewing court is not merely to substitute this court’s judgment for that of the trial court, but to determine whether the court below manifestly abused its discretion. In this case we cannot find such abuse.”
Here, considering defendant’s personal history and background and the circumstances of the case, we do not consider the sentences imposed to be excessive.
This assignment lacks merit.

Conclusion

For the reasons set forth, defendant’s convictions and sentences are AFFIRMED.