660 So.2d 819 (1995)
STATE of Louisiana
v.
Charles E. MARSHALL.
Nos. 81-KA-3115, 94-KH-0461.
Supreme Court of Louisiana.
September 5, 1995.
*821 Elizabeth W. Cole, New Orleans, Charles Marshall, Pro Se, Michael Ward, New Orleans, for applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Mark D. Pethke, New Orleans, Karen E. Godail, Metairie, David L. Arena, New Orleans, for respondent.
WATSON, Justice.[1]
In July of 1981, an Orleans Parish jury found Charles E. Marshall guilty of armed robbery and attempted first degree murder. The trial judge denied a motion for new trial and sentenced Marshall to consecutive terms of 99 years imprisonment for armed robbery and 50 years imprisonment for attempted first degree murder. This is the direct appeal *822 of Marshall's 1981 convictions. La. Const. art. 5, § 5(E).
Although Marshall's appeal was originally placed on the Court's 1983 docket, action on a motion for evidentiary hearing and motion for new trial disrupted the appeal schedule. The district court held an evidentiary hearing ordered by this Court, but failed to rule on the motion for new trial. In 1993, when Marshall appealed the denial of a motion to correct an illegal sentence, his appeal's limbo status was revealed.

FACTS AND PROCEDURAL HISTORY
On August 8, 1980, at approximately 10:30 p.m., two men entered the Fast Pik Food Store in New Orleans, Louisiana. One walked to the back of the store while the other entered the check-out line. When the second man reached the check-out counter, he pulled a waistband gun and told the cashier, Kenneth Duchmann, "this is a holdup" and "to stick the money in the bag." Duchmann told the gunman not to shoot and he would give him the money. Although Duchmann had a gun underneath the counter, he reached for a bag instead. When Duchmann did so, the gunman fired, striking Duchmann once in the head. After the shot, the other man jumped over the counter, took the money from the register and placed it in a bag. The two men then left the store and got into a vehicle driven by a third man.
Police reports placed under seal until this appeal show that Weldon Hills confessed to a number of armed robberies, including the Fast Pik robbery, and named Charles Marshall as an accomplice. When Marshall was identified by other robbery victims, police obtained a search warrant and an arrest warrant. Marshall was arrested April 8, 1981, and made an oral confession to the Fast Pik robbery: Marshall said he shot the cashier in the head when the gun "went off." Marshall was charged with armed robbery and attempted first degree murder. Hills was later adjudicated incompetent to stand trial and was committed to a forensic facility.
On June 2, 1981, Marshall's defense counsel filed a discovery motion seeking all exculpatory evidence discovered in the investigation. In a Bill of Particulars, the defense questioned "[w]as the defendant identified as a perpetrator of the crime, and, if so, when, where, and under what circumstances was the defendant identified, and by whom?"
The state answered it had no exculpatory evidence and that Marshall had been identified in a photo line-up April 6, 1981, by Duchmann. The state disclosed that Marshall had also been identified in photo line-ups on July 13, 1981, by Duchmann's nephew, Donald Vinson, who worked as a stockboy at the Fast Pik, and on July 14, 1981, by Rocklyn Rose, who had been working behind the counter with Duchmann on the night of the robbery.
On June 5, 1981, the defense filed a supplemental motion for discovery which specifically requested information as to: (1) the names of any other persons arrested in connection with the case; (2) the dates of these arrests; (3) whether any of these persons made statements which would exculpate Marshall; (4) whether any other person had been charged with this crime; (5) whether any one admitted to having committed this crime; and (6) whether any person had been identified by the victim as the perpetrator of this crime.
The state answered that Weldon Hills had been arrested on April 2, 1981; no one had made exculpatory statements; the state had no exculpatory evidence; no one else had been charged with the crime; only Marshall and Hills had confessed to committing the crime; and Duchmann had not identified anyone else as the perpetrator of the crime.
At a pretrial suppression hearing, an officer disclosed that Duchmann had been shown an earlier photo line-up in August of 1980 and had made an identification from that set of photos. When the court ordered the state to amend its answers to discovery, the state informed the court "[w]e will be happy to leave this identification out," signifying it would not rely on Duchmann's identification of Marshall at trial.
At trial held July 21, 1981, Duchmann related the events of the robbery. Duchmann did not identify Marshall in court as the gunman. On cross-examination, Duchmann admitted he could not identify his assailant. Regarding previous identifications, Duchmann *823 testified that he had twice been shown pictures, but was unable to make an identification.
Duchmann's nephew, Donald Vinson, a 13-year-old stockboy working in the Fast Pik on the night of the robbery, testified that he saw the gunman from 3-5 feet away in pretty bright lighting. Vinson said he had positively identified Marshall's picture in a photo line-up in July of 1981 and he identified Marshall in-court as the gunman.
Rocklyn Rose, who was also working in the Fast Pik and was standing next to Duchmann when Duchmann was shot, testified he saw the gunman from 2-4 feet away in very good lighting. He also identified Marshall as the gunman in a July 1981 photo line-up and in-court.
Police officers testified that Marshall confessed to the crime, indicating that "the gun went off". The confession was not recorded. A surveillance videotape, which recorded the robbery from a camera mounted over the check-counter, was played for the jury. Duchmann, Vinson and Rose testified the gunman had worn a baseball cap; Duchmann testified the gunman also had on sunglasses but took them off during the robbery. The police photographer testified regarding his unsuccessful attempt to create still photographs from the videotape.
Marshall admitted making the statement to police but denied committing the crime. He stated he told the officers what he had read in the newspaper concerning the robbery. He maintained he was not the videotaped gunman. Marshall testified he confessed because the police had threatened to charge his girlfriend and her sister with the crime. Marshall's girlfriend, Ruby Perkins, and her sister, Joanne Patterson, corroborated that police officers had threatened them with arrest.
The jury returned unanimous verdicts on both counts. After conviction but before sentencing, Marshall's counsel filed a motion for new trial on August 4, 1981. The motion asserted that the state had withheld exculpatory evidence; specifically, that prior to Marshall's arrest, another person was arrested and identified by the victim as the perpetrator of the crime. The district court denied the motion for new trial August 5, 1981. The next day, Marshall was sentenced to consecutive terms of 99 years for the armed robbery conviction and 50 years for the attempted first degree murder conviction, to be served at hard labor without benefit of parole, probation, or suspension of sentence.
In December of 1981, Marshall filed a notice of intent to appeal, a motion to quash, and an assignment of errors. This Court assigned the appeal number 81-KA-3115. Briefs were filed and the appeal was placed on the regular docket with argument set for February 25, 1983.
On July 20, 1982, Marshall filed in this Court a motion for a new trial and a motion to remand for an evidentiary hearing. In his motion, Marshall argued that another individual, James Dorsey, arrested a few days after the crime, had confessed; that Dorsey had named an accomplice, other than Marshall; and that the District Attorney was aware of this information through the New Orleans Police Department.
On September 3, 1982, this Court granted Marshall's motion with the following order:
Granted. The matter is remanded for a hearing on a motion for a new trial based on newly discovered evidence.
This Court did not issue a ruling directly responsive to Marshall's motion for new trial.
The district court held an evidentiary hearing January 26, 1983, and ruled that the prosecution's files contained no exculpatory material. The district court denied Marshall's motion to have the state produce the police report. The district court ordered evidence, including police reports, to be sealed and made part of the record for appeal. Perhaps considering that it had already ruled on a motion for new trial on August 5, 1981, the district court did not explicitly rule on Marshall's motion for new trial which had been filed in this Court in July, 1982.
Based on the district court's ruling on the lack of exculpatory evidence in the prosecution's files and its refusal to order them produced, Marshall sought writs. This Court removed the appeal from its docket and denied *824 Marshall's application with the following language:
Denied. In the event a new trial is not granted, relator may reurge these arguments on appeal. The sealed evidence shall be preserved for this purpose.
State v. Marshall, 429 So.2d 172 (La.1983). The language of this order indicates the Court believed that the district court still might rule on the motion for new trial; if not, Marshall would be entitled to appellate review.
Due to an evident lack of counsel diligence, Marshall did not seek appellate review of his conviction. Instead, Marshall filed a pro se motion for production of documents and a post-conviction application in district court. Marshall did not seek review after the district court denied his requests. Finally, in April of 1993, Marshall filed a motion to correct an illegal sentence in district court and sought review of its denial.
This Court assigned the writ number 94-KH-0461. Upon realizing the procedural posture of the case, the Court ordered the district court to appoint counsel and revived Marshall's appeal.[2]State v. Marshall, 94-0461 (La. 7/1/94), 639 So.2d 1180. Appointed counsel's motion to unseal the evidence in the district court record was granted. Counsel raises three assignments of error: (1) the state withheld exculpatory evidence; (2) Marshall's convictions and sentences violate double jeopardy prohibitions; and (3) the trial judge imposed constitutionally excessive sentences.
Marshall's first assignment of error is based on appointed counsel's review of the sealed evidence unavailable to Marshall's trial counsel. The sealed record reveals that the state failed to disclose exculpatory evidence and falsely responded to pretrial discovery requests.
According to a supplemental police report dated August 13, 1980, police received an anonymous tip August 11, 1980, that James Dorsey and Timothy Jackson had robbed a Church's Fried Chicken restaurant and that Dorsey drove a 1968 Pontiac Bonneville, black over yellow or gold. Realizing that the vehicle was the same as the Fast Pik robbery getaway vehicle, police obtained pictures of Dorsey and Jackson and created a photo line-up. Duchmann identified James Dorsey as one of the perpetrators of the Fast Pik robbery. Duchmann stated: "I'LL NEVER FORGET THAT FACE UNTIL I DIE."
A warrant was issued for Dorsey's arrest August 12, 1980. Dorsey was arrested and confessed to the Fast Pik robbery, naming Larry Holmes as the gunman and a third man as an accomplice. According to Dorsey, both he and Holmes stood in the check-out line. Holmes produced a gun and demanded money when he reached the counter. Dorsey stated Holmes and the cashier argued and Holmes then shot the cashier. When the cashier fell to the floor, Dorsey jumped over the counter and took the money. Dorsey and Holmes then ran to his car.
The police report completed the night of the robbery describes the gunman as 5'8", 200 lbs. A supplemental police report describes the wanted subject, Larry Holmes, as 5'8" to 5'10", 200 lbs.
A physical line-up for the Fast Pik robbery was held August 27, 1980, with James Dorsey and Larry Green. (It is unknown if this is an alias for Larry Holmes; the reported physical characteristics are dissimilar. Green is described as 5'5" and 137 lbs.) Duchmann identified two fill-ins as the robbery perpetrators. Two witnesses who did not testify at trial both identified Larry Green. Neither Vinson nor Rose identified Dorsey as a robbery participant.
The police report completed the night of the robbery indicated that two witnesses saw *825 the getaway car, a 1969 gold Pontiac Bonneville, license number 574B007[3]. Neither of these witnesses testified at trial. Police determined that the license plate was stolen. Dorsey's car, impounded at the time of his arrest, was a 1968 black over gold Pontiac Bonneville, license number 204B179. When asked by police why the license plate on his car did not match the getaway car, Dorsey explained another man had changed the license plate in order to perpetrate a robbery.
On August 29, 1980, the District Attorney's office refused charges against Dorsey. The screening action form gave no reasons for the refusal.
The state concedes this evidence should have been disclosed to the defense. State's Brief, p. 5. The state argues, however, that the non-disclosed evidence is not material enough to warrant a new trial.

LAW AND DISCUSSION

Brady Error
The state's failure to disclose material evidence favorable to a criminal defendant implicates more than the defendant's discovery rights; the prosecutor has an affirmative duty to disclose such evidence under the Fourteenth Amendment's Due Process Clause. Failure to reveal this evidence implicates the defendant's right to a fair trial. U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Ortiz, 567 So.2d 81 (La.1990); State v. Falkins, 356 So.2d 415 (La.1978), cert. denied, 439 U.S. 865, 99 S.Ct. 190, 58 L.Ed.2d 175 (1978).
Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963) held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See State v. Knapper, 579 So.2d 956 (La.1991); State v. Rosiere, 488 So.2d 965 (La.1986). Agurs made clear that, even in the absence of a request, the government is not free from all obligations to disclose and distinguished three situations in which a Brady claim arises: (1) where undisclosed evidence demonstrates that the prosecution's case included perjured testimony that the prosecution knew or should have known was perjured; (2) where the prosecution fails to respond to a defense request for specific exculpatory evidence; and (3) where the prosecution fails to disclose exculpatory evidence requested in a general manner, or not requested at all. Agurs, 427 U.S. at 103-107, 96 S.Ct. at 2397-2399.
U.S. v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), held there was no distinction between exculpatory evidence and impeachment evidence under Brady. See State v. Ortiz, supra. Bagley abandoned the second and third distinctions of Agurs and established that, regardless of whether a request is made, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., 473 U.S. at 682, 105 S.Ct. at 3383. A reasonable probability was defined as "a probability sufficient to undermine confidence in the outcome." Id., see also Knapper, 579 So.2d at 959; Rosiere, 488 So.2d at 970-971.
Kyles v. Whitley, ___ U.S. ___, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), emphasizes four aspects of materiality under Bagley. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." Id., ___ U.S. at ___, 115 S.Ct. at 1566. Kyles explained that the meaning of "reasonable probability" of a different result "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (emphasis supplied). A "reasonable probability" of a different result is shown when the state's *826 suppression of evidence "undermines confidence in the outcome of the trial." Id.
Second, materiality is not a sufficiency of the evidence test. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." Id. After all, a Brady violation is shown, not by "demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.
Third, "once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review." Id. Kyles maintains that even if a harmless-error analysis were applicable, a Bagley error could not be treated as harmless since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, ... necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." Id. (citations omitted).
Finally, materiality must be considered "in terms of suppressed evidence considered collectively, not item-by-item." Id. at ___, 115 S.Ct. at 1567. It is not enough for reviewing courts to consider the impact of each item of exculpatory evidence standing alone; the cumulative effect of the suppressed evidence must be considered. The Constitution does not demand that prosecutors utilize open-file discovery in criminal cases and not every failure to disclose helpful evidence constitutes a constitutional violation. While this leaves prosecutors with discretion, the United States Supreme Court cautions that with this discretion comes a corresponding burden. Id.
On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. Id.

The United States Supreme Court held that a prosecutor has a duty to learn of any favorable evidence known to anyone acting on the government's behalf, including the police. But whether or not this obligation is met, the prosecutor is still responsible for failing to disclose "known, favorable evidence rising to a material level of importance." Id., at ___ _ ___, 115 S.Ct. at 1567-1568.
The issue is whether the exculpatory evidence is material under the Brady-Bagley-Kyles line of cases. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. This Court must provide a cumulative evaluation of the suppressed evidence, keeping in mind that Marshall does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. Marshall need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Kyles, ___ U.S. at ___, 115 S.Ct. at 1569.
Marshall's defense was that he was not the man who robbed the Fast Pik and shot Kenneth Duchmann; moreover, his confession was coerced to protect his girlfriend and her sister. Thus, a primary issue for the jury was the credibility of the eyewitness testimony. The suppressed evidence would have shown that Duchmann had made a strong identification of another man, Dorsey, from a photo line-up just days after the robbery and shooting. The evidence also would have shown, however, that Duchmann was unable to pick Dorsey out of a physical line-up, and instead picked two fill-ins. The only conclusion to be drawn from this information is that Duchmann was unable to identify *827 the man who robbed and shot him. Although Duchmann had identified Marshall in a separate photo line-up, that information was not presented to the jury. Instead, Duchmann admitted at trial that he was unable to make an identification. This is consistent with the information the suppressed evidence would have imparted. The suppressed evidence did not impeach eyewitness testimony. Compare Kyles, ___ U.S. at ___, 115 S.Ct. at 1569-1571.
The facts that Dorsey confessed to the crime and that the getaway vehicle was linked to him are exculpatory for Marshall only to a point. Dorsey's confession that he took the money did not preclude Marshall's participation as the gunman. The jury was presented with the information that Marshall and another man entered the Fast Pik, that Marshall told Duchmann to give him money, that Marshall fired at Duchmann, and that another man jumped over the counter and took the money. Marshall and this other man ran out of the store where, presumably, another person waited in the getaway vehicle. This evidence did not create a reasonable doubt about Marshall's criminal participation. State v. Square, 433 So.2d 104, 108 (La.1983).
In addition, the suppressed evidence shows the state did not have a strong case against Dorsey. Despite Duchmann's strong photo identification of Dorsey, Duchmann was unable to pick Dorsey out of a physical line-up. Dorsey's confession, which included an argument between the cashier and the gunman and the fact that the gunman and his accomplice stood together, differed from the facts of the robbery and shooting related by every other person, including Marshall. The suppressed evidence shows Dorsey was not identified as a robbery participant by either eyewitness who was in the store during the robbery nor by any of the eyewitnesses standing outside who did not testify at trial.
The fact that Dorsey named another person, not Marshall, as the shooter is obviously exculpatory evidence. It fails to constitute material evidence in this case, however, because confidence in the outcome of trial is not undermined by its disclosure. Both Vinson and Rose identified Marshall as the shooter after seeing him from a few feet away during the robbery and shooting. Marshall confessed to the crime. A videotape of the robbery and shooting showing the shooter was played for the jury.[4] It is not reasonably probable that the result of the proceeding would have been different had evidence that Dorsey named another as the shooter been disclosed to the defense. This conclusion remains even after a cumulative review of the suppressed evidence. Marshall is not entitled to a new trial on this ground.
Marshall also claims entitlement to a new trial because the suppressed evidence shows the prosecution relied on false or perjured testimony at trial. Agurs. Rudimentary principles of justice are offended when a prosecutor deceives a court by knowingly presenting false evidence. Justice is similarly offended when the prosecutor, although not soliciting false evidence, allows it to go uncorrected. Giglio v. U.S., 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103, 96 S.Ct. at 2397. A lower standard of materiality exists for these violations because they corrupt the truth-seeking function of the trial process. Id., 427 U.S. at 104, 96 S.Ct. at 2397; see Kirkpatrick v. Whitley, 992 F.2d 491 (5th Cir.1993).
At trial, Duchmann testified regarding prior identifications as follows:
Q. When did you first make an identification of the person who shot you?
A. I was shown pictures twice, I could not exactly say yes or no.
Q. You were shown pictures twice?
A. Yes.
Q. When was this?
A. I can't remember exactly dates, but I know after I got out of the hospital about three days later they showed me *828 pictures and then another time in the District Attorney's Office.
Q. The first time you were shown pictures about three days after you were shot, did you make an identification at this time?
A. I can't say yes or no because I was not positive.
Q. Did you make an identification of someone at that time?
A. The first time?
Q. Yes.
A. Yes sir. No.
Q. You did not make an identification the first time?
A. No.
Q. This was three days after you were shot? And you made no identification at that time?
A. No.
Q. Did you have another occasion to try and identify someone?
A. Yes.
Q. Where was that?
A. I don't know if it was the Detectives or the District Attorney's Office.
Q. When was that, sir?
A. June or July.
Q. At that time did you make an identification?
A. No.
Q. You did not make one at that time either?
A. No.
Tr. 44-46.
In fact, the suppressed police reports show that Duchmann made a positive identification of James Dorsey in a photographic line-up three days after the robbery and shooting. He also made two other identifications. He identified two fill-ins at a physical line-up August 27, 1980, and he picked Marshall's photo at a photo line-up April 6, 1981. When Duchmann testified falsely at trial, the prosecutor remained silent.
The effect of this information has been discussed under the heavier burden of Bagley materiality. The false testimony hid the fact that Duchmann made several identifications of different persons. The appropriate conclusion is that Duchmann could not identify his assailant. Duchmann subsequently admitted at trial that he was unable to make an identification. Thus, there is no reasonable likelihood that the false testimony affected the jury's judgment. Marshall is not entitled to a new trial on this ground.

Double Jeopardy
Both the United States and Louisiana Constitutions protect a defendant from double jeopardy, which includes multiple punishments for the same offense. U.S. Const. amend. V; La. Const. art. I, § 15; State v. Coody, 448 So.2d 100 (La.1984). Marshall was convicted of attempted first degree murder in violation of LSA-R.S. 14:27 and 14:30 with armed robbery as the underlying felony and of armed robbery in violation of LSA-R.S. 14:64. The trial court imposed the maximum sentence allowable for each crime, 50 years for attempted first degree murder and 99 years for armed robbery. The court ordered the sentences to be served consecutively without the benefit of probation, parole or suspension of sentence.
The state concedes the prohibition against double jeopardy does not permit Marshall to be punished for both attempted first degree murder during an armed robbery and armed robbery. State's Brief, p. 7; see State ex rel. Adams v. Butler, 558 So.2d 552 (La.1990); State v. Smith, 600 So.2d 919 (La.App. 4 Cir.1992), writ denied 625 So.2d 1031 (La. 1993); State v. Jackson, 548 So.2d 57 (La. App. 3 Cir.1989).
Where multiple punishment has been erroneously imposed, this Court has vacated the conviction and sentence of the less severely punishable offense and affirmed the conviction and sentence of the more severely punishable offense. See State ex rel. Adams v. Butler, 558 So.2d 552 (La.1990); State v. Doughty, 379 So.2d 1088 (La.1980).
Although in some cases the Court has vacated the sentences of both convictions and remanded for resentencing in order to ensure that the original sentencing scheme will be maintained, see Adams; State v. Dubaz, 468 So.2d 554 (La.1985), that is not *829 necessary in this case. Marshall received the maximum sentence for both convictions; it is clear the trial judge did not structure a scheme of interdependent sentences. Accordingly, the conviction and sentence for attempted first degree murder will be vacated; the conviction and sentence for armed robbery are affirmed.

Excessive Sentence
Marshall complains that the district court imposed unconstitutionally excessive sentences by sentencing him to the maximum allowable for each offense to be served consecutively. Since the Court has already found that Marshall's conviction and sentence for attempted first degree murder must be vacated, the only remaining issue is whether Marshall's 99 year sentence for armed robbery is unconstitutionally excessive.
The Louisiana Constitution prohibits the imposition of excessive punishment. La. Const. art. I, § 20. The statutorily prescribed penalty for armed robbery is imprisonment at hard labor for not less than five years and for not more than 99 years, without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:64. A sentence may violate a defendant's constitutional right against excessive punishment even if it is within the statutory limit. State v. Sepulvado, 367 So.2d 762 (La.1979). To determine whether a particular sentence is excessive, this Court must decide whether it is so disproportionate to the severity of the crime as to shock the senses of justice. State v. Bonanno, 384 So.2d 355 (La.1980).
At the time of Marshall's conviction in 1981, LSA-C.Cr.P. art. 894.1 provided that a sentence of imprisonment should be imposed if a defendant had been convicted of a felony if there was undue risk that another crime would be committed during a suspended sentence or probation, if the defendant was in need of correctional treatment or a custodial environment, or if a lesser sentence would deprecate the seriousness of the defendant's crime. LSA-C.Cr.P. art. 894.1(A). While the district court had great discretion in imposing sentence, the statute listed factors to consider in determining whether probation or a suspended sentence was appropriate. LSA-C.Cr.P. art. 894.1(B). Finally, the statute directed that a district court "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." LSA-C.Cr.P. art. 894.1(C).
This Court must ensure that Marshall's sentence was individualized and tailored to him and the particular offense he committed. State v. Lathers, 414 So.2d 678 (La.1982). Although not every aggravating and mitigating circumstance needs to be articulated, the record must show the sentencing court adequately considered the sentencing guidelines. Id.
The sentencing transcript shows the district court considered Marshall's age and prior record. Marshall had two prior convictions for aggravated battery and simple burglary. The district court specifically mentioned review of the videotape and the circumstance that the victim was shot as the factual basis for the sentence. While a more detailed recitation would have been more helpful, the record provides the Court with an adequate basis for review. See State v. Douglas, 389 So.2d 1263 (La.1980). The videotape would have shown that Marshall placed several persons' lives in jeopardy during the armed robbery and shot Duchmann in the head. That Duchmann lived is fortuitous and not, as Marshall argues, a mitigating circumstance.
Comparison of this crime with other armed robberies shows that a 99 year sentence for an armed robbery where the victim is seriously wounded is not excessive or grossly disproportionate to the seriousness of the crime. See Douglas, 389 So.2d at 1267-1268; State v. Grillette, 588 So.2d 1338 (La.App. 2 Cir.1991); State v. Collins, 557 So.2d 269 (La.App. 4 Cir.1990); State v. Wright, 535 So.2d 765 (La.App. 2 Cir.1988); State v. Clark, 499 So.2d 332 (La.App. 4 Cir.1986); State v. Weeks, 449 So.2d 1158 (La.App. 2 Cir.1984); State v. Wilson, 452 So.2d 773 (La.App. 4 Cir.1984). This assignment of error has no merit.

*830 CONCLUSION
While the state suppressed exculpatory evidence it should have disclosed to Marshall prior to trial, a cumulative review of the suppressed evidence shows it did not constitute material evidence which would necessitate a new trial. Marshall received a sentence which violates double jeopardy principles. Therefore, the conviction and sentence for attempted first degree murder are vacated, the conviction and sentence for armed robbery are affirmed. The 99-year sentence for armed robbery is not excessive under the facts of this case.
VACATED IN PART; AFFIRMED IN PART.
LEMMON, J., not on panel. Rule IV, § 3.
NOTES
[1] Judge Morris A. Lottinger, Jr., Court of Appeal, First Circuit, participating as Associate Justice Pro Tempore, in place of Associate Justice James L. Dennis.
[2] The Court granted Marshall's motion with the following language:

Granted. Relator's application is granted for the sole purpose of consolidating it with his pending appeal in No. 81-KA-3115. The district court is ordered to appoint counsel for relator for purposes of reviving that appeal. The district court shall provide this court with notice of the appointment of counsel at which time new briefing notices will issue for purposes of providing counsel the opportunity to supplement the briefs previously filed. The court will then redocket the case for argument and decision according to its customary procedures.
[3] Although an evidence technician's report notes that the vehicle was gray, all other police reports and narratives describe the Bonneville as gold, or black over gold or yellow.
[4] The videotape is no longer in the record.