| MAMES F. McKAY III, Judge.
STATEMENT OF CASE
On August 15, 2002, the State indicted Louis Walton with one count of aggravated rape (count one) and two counts of indecent behavior with a juvenile (counts two and three), violations of La. R.S. 14:42 and 14:81, respectively. Walton pled not guilty at his arraignment on August 20, 2002. On December 16, 2002, the trial court denied Walton’s motions to suppress. On March 27, 2003, the jury convicted Walton of one count of sexual battery (count one) and one count of attempted indecent behavior with a juvenile (count two). On April 3, 2003, the State multiple billed Walton charging him as a fourth felony offender. On July 9, 2003, the court, as to count one, ad judged Walton a third felony offender, and sentenced him on count one to twelve years, with credit for time served, and on count two, to a consecutive sentence of seven years, with credit for time served. Also on that date, the court granted Walton’s motion for appeal. On July 11, 2003, the court vacated Walton’s original sentence on count two, and re-sentenced him on that count to a consecutive sentence of three and one-half years, with credit for time served.
STATEMENT OF FACT
lain the early morning hours of June 13, 2002, New Orleans Police Department (NOPD) Officer Carlos Peralta and his partner responded to a radio dispatch call concerning the rape of a juvenile at 1322 Annette Street. When Officer Peralta arrived on the scene, he saw the defendant standing in the middle of the street. Officer Peralta noticed three juvenile females, M. R., P. R., J. R., their mother, A. R., and her friend Felicia Williams. A.R. and Ms. Williams were very upset and verbally confronting the defendant, who appeared nervous and scared. Officer Peralta’s partner handcuffed the defendant and placed him in the patrol unit, while Officer Peralta interviewed the children and adult females separately. Officer Peralta learned from A.R. that Ms. Williams arranged for a babysitter for the children at Ms. Williams’ residence on Annette Street, while A.R. and Ms. Williams went to a neighborhood bar.
*1224 A.R. testified that she took her three daughters and son to the house at about 10:30 p.m. on June 12, 2002. A.R. said that while she and Ms. Williams were out, the defendant exposed himself to her daughters, raped M.R. and demanded oral sex from P.R. After speaking with the witnesses, Officer Peralta radioed for investigation assistance.
Detective Vernon Haynes of the NOPD Child Abuse Unit responded to Officer Peralta’s call. Detective Haynes observed the defendant sitting in the rear of the police unit. When Detective Haynes approached the defendant, he noted that the defendant smelled of alcohol, and appeared to be “very intoxicated”. Detective Haynes conferred with Officer Peralta, who briefed Detective Haynes on the facts of his investigation. Detective Haynes transported the victims and their mother to University Hospital. At the hospital, the victims related to Detective Haynes the night’s events. The medical staff at the hospital examined M. R., and | ¡¡completed a rape examination kit[1], which Detective Haynes later filed with the NOPD central evidence and property room. Detective Haynes then accompanied M. R., P.R. and J.R. to the Child Advocacy Center, where the three children gave audio and video recorded statements explaining what the defendant had done to them. The statements given by the children at the Advocacy Center corroborated the statements they made to Detective Haynes at the hospital.
A.R. told Detective Haynes that she and Felicia Williams, the defendant’s girlfriend, agreed to go to a neighborhood bar that night. Ms. Williams arranged to have a babysitter at her house for A. R.’s three daughters, eleven-year-old M. R., eight-year-old P.R. and four-year-old J.R. When A.R. and her daughters arrived at the residence, the defendant was not there. A.R. and Ms. Williams left the house about 10:30 p.m. The children watched television in Ms. Williams’ bedroom while their mother was out. The women returned to the house about 2:00 a.m.; however, they could not enter the house because the defendant had bolted the side door. Ms. Williams called to the defendant to unlock the door, which he did. As the women entered the house, A.R. saw the defendant clothed in a white t-shirt, and wrapped in the curtain/sheet, which was hanging on the doorway of the bedroom where the children were. The children ran to A.R. and Ms. Williams and reported what the defendant had done. M.R. told her mother that the defendant exposed himself to the children, and then vaginally and anally raped her in his bed and on the sofa in the living room. P.R. said that the defendant tried to lure her into his room. J.R. reported that the defendant asked her for oral sex.
|4Petective Haynes reported that on the night of the incident, Ms. Williams said she had arranged to have Ashley Ramee watch A. R.’s children at Ms. Williams’ house while the women went clubbing. Ms. Williams met the defendant in a neighborhood bar, and told him the children were in the house. Ms. Williams and A.R. returned home to find the defendant hiding his bottom torso behind a curtain. The defendant explained to Ms. Williams that he had just taken a shower, and that the women surprised him as he exited the bathroom. He covered himself with the curtain so as not to disrespect A. R.
*1225 Emergency room pediatrician, Dr. Diane Kirby, examined M. R., in the early morning hours of June 13, 2002. Dr. Kirby’s visual examination of M. R.’s genital area revealed that M. R.’s hymen had been perforated, and that she suffered a vulva abrasion. Dr. Kirby deemed M. R.’s injuries consistent with M. R.’s report that the defendant penetrated her vaginally and rectally with his penis.
Pursuant to Dr. Kirby’s findings, Detective Haynes arrested the defendant two or three days after the incident. The defendant waived his rights, and gave a statement in which he told Detective Haynes he was not aware the children were in the house because he left prior to their arrival. The defendant stated that he left the house to go clubbing. He returned home at about midnight and took a shower. He had a t-shirt and shorts on when he exited the bathroom. At that time he saw the children for the first time, and they saw him. The defendant denied harming the children in any way.
M.R. testified that after her mother and Ms. Williams left the house, she, P.R. and J.R. watched television in Ms. Williams’ bedroom. M.R. fell asleep. She awoke to feel the defendant stroking her buttocks. The defendant led her by her arm into his bedroom, locked the door, and removed his underwear and hers. He |splaced her on his bed, and penetrated her vaginally. Next, he took her to the living room where he raped her again. After the attack, M.R. ran back to her sisters and told them what happened. She warned them not to go with the defendant. Shortly thereafter, the defendant called for J.R. to come to him in the living room. When he got no reply, he went to the children. He was nude from the waist down. He asked P.R. to go to his bedroom, but she refused. Next, the defendant lured J.R. away from her sisters by telling her that he had candy for her. When A.R. and Ms. Williams returned home, they could not enter the house by the side door because it was bolted. As A.R. entered the house M.R. told her mother what the defendant had done.
P.R. testified that she fell asleep watching television with her sisters in Ms. Williams’ bedroom. She woke up when M.R. came into the bedroom crying. M.R. said the defendant had done something to her, and told the others not to leave the bedroom. The defendant walked into the bedroom; he was nude from the waist down. He told P.R. to come with him because her mother wanted to speak to her. P.R. refused to leave her sisters.
J.R. testified that the defendant told her he would give her some candy if she would accompany him to the front of the house. J.R. went with the defendant. The defendant held J. R.’s head and pulled it toward his genitals. He “tried to make [J.R.] suck his thing where he use it.” J.R. escaped from the defendant and ran to her sisters.
Byron Walton, the defendant’s brother, testified that he and his brother went clubbing on the night of June 12-13, 2002. He returned home at midnight to find the house dark. There were no lights on in Ms. Williams’ bedroom. Byron said he secured the house by bolting the side door. Shortly after he got home, the | (¡defendant entered the house by the front door and the two spoke briefly. Byron noticed that the defendant was intoxicated. The defendant then retired to his room. Byron went upstairs to his bedroom. About fifteen or twenty minutes later, Byron heard Ms. Williams enter the house. She called him to come downstairs, and told him that A.R. was calling the police because M.R. said that the defendant “fondled” the children. Byron denied hearing any noises or disturbances in the house from the time the defendant entered the house until Ms. Williams came home.
*1226 Ashley Ramee also testified for the defense. She told the jury that she and Byron Walton had a child together, and that she was sleeping in the upstairs bedroom of the Annette Street residence on the night in question. She denied knowing that the children were in the house, and further stated that she heard nothing out of the ordinary that night.
The defense read Ms. Williams’ testimony which was taken earlier for perpetuation at trial. Ms. Williams’ testimony indicates that at about midnight, she called the defendant on his cell phone to tell him that A. R.’s children were at the Annette Street resident. When she and A.R. returned home, the defendant was clothed when he opened the side door for them. He retired to his room and she went into her bedroom, to check on the children. None of the children was upset or crying. M.R. told her that the defendant had touched her. Ms. Williams spoke to the defendant about what M.R. said. The defendant denied touching the children. The defendant’s uncle, brother and his brother’s girlfriend were in the house that night. None of them heard any sounds from the children. A.R. and her children left the house to call the police, even though Ms. Williams offered them 17the use of her cell phone. The children were not crying or upset until after their mother called the police.
The defendant testified. He stated that he and his brother left their house about 8:00 p.m. to visit a neighborhood bar on the night of June 12, 2002. He spoke to Ms. Williams and A.R. at the bar and then left to visit another bar. He got home about 3:00 a.m. and entered through the front door. He called to his brother, who was eating in the kitchen. The defendant walked to the back of the house to check on his godchild, and encountered A. R.’s children for the first time. He was surprised to see the children because he was unaware they were there. He walked back to his bedroom in the front of the house, undressed and got into bed. About ten minutes later, he heard knocking at the side door. He put on some clothes and unbolted the door for Ms. Williams, who was alone. He returned to his bed. About ten minutes later Ms. Williams called him and told him A.R. accused him of touching her children. He denied the accusation to A.R. He offered her the use of his cell phone to call the police; A.R. used a payphone instead. The first officers on the scene placed him in their patrol unit, but later released him, advising him not to go near the children. The defendant denied interacting with the children in any way, and emphatically denied taking a bath while the children were in the house. The defendant did not hear of the rape allegation until after his arrest.
ERRORS PATENT
A review for errors patent on the record reveals one.
The record of the proceedings in the trial court does not indicate that the trial judge told the defendant at sentencing that, pursuant to La.R.S. 14:43.1(C), he is not eligible for parole, probation, or suspension of sentence. La.R.S. 14:43.1(0) |srequires that a defendant’s sentence under the sexual battery statute shall contain such restrictions.
La. R.S. 15:301.1(A) provides as follows: When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the *1227 sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
In State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, the Louisiana Supreme Court held that where statutory restrictions, such as those enumerated in La.R.S. 14:43.1(C), are not recited at sentencing, those restrictions are deemed to be contained in the sentence by operation of La.R.S. 15:301.1(A). The Supreme Court determined that La.R.S. 15:301.1(A) “self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute.” Williams, 800 So.2d at 799. Pursuant the Louisiana Supreme Court’s decision in Williams, the trial judge’s failure to specify that the defendant’s sentence was subject to the restrictions listed in La.R.S. 14:43.1(C) does not require remand for correction; instead, the judge’s sentence is deemed to include those restrictions by operation of law. Accordingly, any such error requires no action by this Court.
ASSIGNMENT OF ERROR NUMBER 1
In the first of two assignments, the defendant complains the trial judge violated his Sixth Amendment right of confrontation. Specifically, he argues that |nhe should have been allowed to present evidence to refute the State’s claim that M.R. had no prior sexual contact.
C.E. art. 412 provides that before a person accused of committing a crime that involves sexually assaultive behavior may offer evidence of the victim’s past sexual behavior, the accused shall make a written motion to offer such evidence, accompanied by a written statement of evidence setting forth the names and addresses of persons to be called as witnesses. C.E. art. 412(C)(1). The motion shall be made within the time for filing pre-trial motions specified in C.Cr.P. art. 521, except that the trial court may allow the motion to be made at a later date. C.E. art. 412(D). After the motion is filed, the trial court determines the admissibility of the evidence at a hearing. C.E. art. 412(E).
In this case, there is no evidence in the record that the defendant complied with those requirements. Nevertheless, defendant was not prejudiced by the restriction because defense counsel succeeded in eliciting testimony from Ms. Adrienne Denson, an investigator with the Public Defender’s Office, that she learned from A.R. during an interview that “[M. R.] had been tampered with by her cousin.” Moreover, replying to cross-examination, A.R. acknowledged to defense counsel that this was the first [sexual] incident M.R. had reported to her “[a]s far as with a grown man ...
This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER 2
In the second assignment of error on appeal, the defendant asserts that his sentence is unconstitutionally excessive. He frames his excessiveness argument in terms of the trial judge imposing the maximum sentence on one count, a lengthy h (¡sentence on the other count, without providing any factors to support the sentence, and by requiring that the sentences be served consecutively.
In this case, the defendant was charged with one count of aggravated rape and two counts of indecent behavior with a juvenile; however, the jury convicted him of the lesser offense of sexual battery (La. R.S. 14:43.1) on count one and attempted inde *1228 cent behavior with a juvenile (La. R.S. 14:81) on count two, and acquitted him on count three. The court sentenced the defendant to twelve years on the sexual battery charge and three and one-half years for attempted indecent behavior with a juvenile, the sentences to be served consecutively. The maximum sentence for count one is twenty years. See La. R.S. 15:529.1. The maximum sentence on count two as the attempted indecent behavior with a juvenile is three and one half years and/or a fine of not more than $2,500.00.
 The standard of review for Louisiana appellate courts in determining whether a sentence levied upon a particular defendant was excessive is the manifest-abuse-of-discretion standard. State v. Guzman, 99-1753, 99-1528 (La.5/16/00), 769 So.2d 1158. A trial judge has considerable latitude in imposing sentences within the constraints provided by law. State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330. However, in State v. Marshall, 81-3115, 94-0461, p. 24 (La.9/5/95), 660 So.2d 819, 829, the Louisiana Supreme Court held that “[a] sentence may violate a defendant’s constitutional right against excessive punishment even if it is within the statutory limit,” citing State v. Sepulvado, 367 So.2d 762 (La.1979). Furthermore, under Louisiana law, a sentence is unconstitutionally excessive if it “makes no measurable contribution to acceptable goals of punishment” and hence is “nothing more than the purposeful imposition of pain and suffering; and is grossly out of proportion to the severity of the crime.” State v. Handy, 96-2505, p. 1 (La.1/6/97), 686 So.2d 36, 37, citing State v. Dorthey, 623 So.2d 1276 (La.1993). The Louisiana Supreme Court has provided a list of several factors that appellate courts are to consider in ascertaining whether a sentence, by its excessive duration or severity, is grossly disproportionate to the underlying offense. State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, citing State v. Telsee, 425 So.2d 1251, 1253-54 (La.1983). The appellate court’s analysis of the sentence is cumulative and centers on an amalgam of relevant factors. Id. Among these factors the Supreme Court notes, are “the nature of the offense and the offender, a comparison of the punishment with sentences imposed for similar crimes, the legislative purpose behind the punishment, and a comparison of the punishment provided for this crime in other jurisdictions.” Baxley, 656 So.2d at 980, citing Telsee, 425 So.2d at 1253-54.
Even though Louisiana law favors concurrent sentences, a trial court retains the discretion to impose consecutive sentences on the basis of other factors, including the offender’s past criminality, violence in the charged crimes, or the risk that the defendant poses to the general safety of the community. State v. Thomas, 98-1144 (La.10/9/98), 719 So.2d 49. When consecutive sentences are imposed for crimes arising out of the same act, the trial court must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P. art. 894.1; State v. Dempsey, 2002-1867 (La. App. 4 Cir. 4/2/03), 844 So.2d 1037. Consecutive sentences for crimes arising out of the same act are not per se excessive if other appropriate factors are considered. Id.
The heinous nature of the offenses in this case is apparent. According to the record, the defendant exposed himself to the victims. He was intimate and cruel to |12M. R., to the extent of attempting intercourse, not once but twice. He was equally cruel to J.R. by holding and pulling the child’s head to his genital area, and demanding that she perform fellatio on him. The victims’ ages, eleven and *1229 four, respectively, make this offense even more grievous. They undoubtedly will suffer repercussions from the defendant’s reprehensible conduct for years to come. Considering the nature of the offenses, and the trauma and pain experienced by the victims, twelve years of imprisonment as a third felony offender for committing sexual battery upon an eleven-year-old female, and three and one-half years, without a fine, for attempted indecent behavior with a four-year-old is not unreasonable punishment; nor is it an example of needless imposition of pain. Moreover, the sentences are not grossly disproportionate to the severity of the offenses, and do not evince a manifest abuse of discretion on the part of the trial judge. See State v. DeLaughter, 29,974 (La.App. 2 Cir. 12/10/97), 703 So.2d 1364 (sentence of seven years for indecent behavior with juvenile and sentence of three years for attempted indecent behavior with juvenile were not excessive even though defendant was first-time felony offender, had diminished mental capacity and was physically disabled); State v. Taylor, 95-179 (La.App. 3 Cir. 10/4/95), 663 So.2d 336 (consecutive sentences of eight years for sexual battery and three years for attempted indecent behavior with juvenile were not excessive for first felony offender); State v. Hubb, 97-304 (La.App. 5 Cir.9/30/97), 700 So.2d 1103, (six and one half and seven year sentences were not constitutionally excessive for two defendants who had pled guilty to sexual battery; defendants “french” kissed both victims on several occasions; one defendant exposed his genitals to both children and forced one of the children to fondle him; the other defendant attempted to make one of the children fondle him, and showed the other child photographs of |13nude women; one of the defendants had no criminal history and the other had only misdemeanor offenses).
Nor do the defendant’s arguments that the trial judge’s failure to provide factors to support the sentence, and reasons for ordering that the sentences be served consecutively, show the court violated the principles against excessive punishment.
The defendant in this case addressed the trial judge at sentencing and requested that he be shown leniency because he was the father of two children, who needed his care and guidance. The judge’s response to the defendant’s request clearly indicates the court imposed the sentence it did for sound reasons. The court considered that the defendant’s conduct manifested deliberate cruelty to the victims, and that the defendant knew the victims were particularly vulnerable because of their age. Moreover, the judge clearly indicated he felt the defendant required a custodial environment because of the likelihood he would re-offend if given access to children again. Thus the trial judge did comply with the guidelines of La.C.Cr.P. art. 894.1. This assignment is without merit.
Accordingly, we affirm the convictions and sentences.
AFFIRMED.

. The State and the defense stipulated that the samples in the rape kit tested negative for seminal fluid.