705 So.2d 758 (1997)
STATE of Louisiana
v.
Manuel NELSON and Lawrence Peters.
No. 96-KA-0883.
Court of Appeal of Louisiana, Fourth Circuit.
December 17, 1997.
*759 Keith Couture, Chalmette, for Defendant-Appellant Manuel Nelson.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for Defendant-Appellant Lawrence Peters.
Harry F. Connick, District Attorney, Theresa A. Tamburo, Assistant District Attorney, New Orleans, for Plaintiff-Appellee.
Before KLEES, LANDRIEU and CIACCIO, JJ.
KLEES, Judge.
On October 6, 1994, appellants Lawrence Peters and Manuel L. Nelson were charged by bill of indictment with the second degree murder of William Henry Jones on July 16, *760 1994, and the second degree murder of Edward Elbert Wynn on July 10, 1994. The trial was completed on August 17, 1995, with verdicts of guilty as charged as to both defendants on both counts. On October 17, 1994, appellant Nelson was sentenced to life imprisonment at hard labor without parole. On October 27, 1994, appellant Peters was likewise sentenced to life imprisonment at hard labor without parole.
Nelson moved for appeal shortly after sentencing. Peters subsequently moved for an appeal which was granted on July 10, 196.

FACTS
On July 10, 1994, at around 2:30 a.m., in the 3700 block of North Dorgenois in the Florida Housing Project, Edward Elbert "Little Wynn" Wynn was shot several times by two assailants. The autopsy revealed that the victim had eighteen gunshot wounds entering from the front and back and from the base of his neck, down his torso and through his extremities. Although the toxicology report indicated a high level of alcohol and the presence of cocaine, the cause of death was from the gunshot wounds.
On July 16, 1994, at around 9:30 a.m., in the 3800 block of North Dorgenois in the Florida Housing Project, William Henry "Peewee" Jones was shot several times by two assailants. The autopsy revealed that the victim had fifteen gunshot wounds entering from the front and back. The toxicology report from this autopsy likewise revealed a high level of alcohol and the presence of cocaine, but the cause of death was from the gunshot wounds, several of which would have been immediately fatal.
Mary Jenkins witnessed the July 10 murder. She was alerted by someone who told her that her son was arguing with two men. She then observed the two defendants shooting the victim. After the shooting stopped and the defendants left the scene, she saw that the victim was not her son. She recognized both defendants. She knew them as "Sonny" (defendant Nelson), who grew up with her son, and "Lawrence" (defendant Peters), who lived in the area. Jenkins did not immediately notify the police that she witnessed the first murder because she was frightened. Subsequently, she heard Sonny bragging to people downstairs from where she was staying, as to how he killed "Peewee," (the July 16 victim). Jenkins then went to the Homicide Division and identified both perpetrators from photographic line-ups and made a statement.
Valerie Robair testified that she witnessed both murders. In the case of the July 10 murder, Robair was unable to sleep and so was looking out of her front window when she observed the victim standing next to a car talking to some people for a few minutes. The defendants told the victim to get off the car. The car pulled away and the defendants opened fire on the victim. After the victim fell to the ground, the perpetrators continued shooting. Although Robair recognized the perpetrators, she was afraid to notify the police. In the case of the July 16 murder, Robair had just stepped outside with a drink of water and her four-year-old had followed her outside. She observed the victim get out of a red car and walk around the building. When he came back to the front, the defendants started shooting. Again the defendants continued shooting the victim after he fell to the ground.
Robair knew both of the defendants. Sonny (Nelson) went to school with her son and Lawrence lived in the area. Following the July 16 murder, Robair called Crimestoppers to report that she had witnessed the murders and knew the perpetrators. She was presented with a photographic lineup from which she recognized defendant Nelson, but was afraid to sign her name to the photograph. At the time of that interview, Homicide Detective Michael Mims did not have a photographic line-up of Peters. Robair only knew Peters by his first name, but called Det. Mims when she saw Peters on the street. She advised Det. Mims of Peters's location, a clothing description and a physical description, which included tattoos of a cross and teardrops on his face.
Mary Gonzales, sister of the July 16 victim, Peewee Jones, advised the police after the shooting that her brother's vehicle was missing. The vehicle was subsequently located in the 3200 block of North Dorgenois, six blocks from the shooting. The driver's door had a *761 bullet hole, grazings and blood on it. Detective Mims interviewed Tyrone Smothers and Leroy Adams, who drove the vehicle the six blocks and parked it. Smothers and Adams admitted witnessing the shooting but denied seeing the face of either shooter. The other eyewitnesses did not identify Smothers, Adams or another named suspect, Elliot Montana, as the shooters.
As to both shootings, the eyewitnesses saw no actions by the victims against the shooters. The witnesses further saw no weapons in the hands of the victims, nor were weapons found on the scene.
The ballistics report, which was entered into evidence by stipulation because the ballistics expert was unavailable, indicated that the shell casings at both scenes were fired by two weapons; and the casings at the first scene were fired by the same weapons as the casings at the second scene.
Danielle Johnson testified for defendant Nelson that she and Nelson were walking to the store on July 16 when they heard the gunshots. They then went to the scene to see what happened. She further testified that she and Nelson were asleep in bed when the July 10 murder occurred.
Kenneth Alford and Giselle Robinson testified for defendant Peters that they were with Peters on July 10, from 10:00 p.m. until 4:30 a.m. the next day, at Club Rumors. The witnesses testified to being with Peters on Sunday evening, July 10. The murder of Peewee Jones occurred at 2:30 a.m. on July 10, early Sunday morning.

II. ASSIGNMENTS OF ERRORNELSON

ASSIGNMENT ONE
The appellant argues that the District Attorney withheld relevant and necessary Brady material from the defendant, which could have changed the result of the trial. "The suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). Evidence is material, and hence discoverable, if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Evidence that the government failed to disclose to the defendant is considered collectively, not item-by-item, in determining whether the "materiality" requirement of a Brady violation has been satisfied. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819.
Appellant Nelson avers that information in the supplemental police reports was exculpatory and material and would probably have changed the outcome of the case. The supplemental homicide reports were attached to counsel's brief. Nelson notes three items which were alleged to be exculpatory.
First, the supplemental report on the July 10 murder of victim Wynn indicates that on July 28, at 2:30 a.m., three officers went to 2438 Pauline Street where they interviewed Valerie Robair. She advised them that she did not witness the July 10 murder as she was sleeping at the time. She further advised that she had heard that suspects named Sonny and Lawrence had committed the murder. She further advised that she could never testify because the killers lived in the project across from her house and would not hesitate to kill her.
However, Ms. Robair then admitted to having witnessed the July 16 murder of Peewee Jones while she was outside with her four-year-old. She added that the perpetrator shot at her because she saw the shooting. At trial, Ms. Robair testified that she witnessed both murders. The discrepancy is mitigated by the fact that the interview was conducted at 2:30 a.m. and Ms. Robair explained at trial her fear of the perpetrators, such that she would not sign the photo of Nelson at a photo identification, though she could identify him, and she cooperated with Detective Mims in locating and arresting Peters.
While this information could certainly have been used for impeachment, considering the *762 testimony of another eyewitness, Mary Jenkins, this information would not alone have led to a "reasonable probability" of a different outcome.
The second allegedly exculpatory evidence in the homicide report is the mention of another suspect, Elliot Montana. The supplemental report of the July 16 murder indicates that Officer Derrick Frick was informed by a concerned citizen that Elliot Montana was the perpetrator. Det. Mims knew Montana by his nickname of "Manny." Montana's photograph was put into a photographic lineup to be viewed by Tyrone Smothers and Leroy Adams, the two occupants of the vehicle victim Peewee Jones was leaning on just prior to the shooting. Smothers admitted being in the vehicle but stated that he could not see the faces of the perpetrators. Adams gave a similar recounting of the events of the shooting and agreed to look at the photographic lineup, but could not or would not make an identification.
Subsequent to the interviews with Smothers and Adams, Officer Timothy Winn was informed that the perpetrator of all the murders in the Florida Housing Project was Elliot "Manny" Montana. Officer Winn further was informed that the lady who lived next door to the church on North Dorgenois witnessed the murder. That lady was Valerie Robair, who knew the perpetrators as "Sonny" and "Lawrence." Ms. Robair viewed four photographic lineups, one with Elliot Montana, from which she made no identification, and one with appellant Nelson, whom she identified, but refused to sign the photograph. Peters had not been arrested at that time. Witness Mary Jenkins identified both defendants in photographic lineups.
Elliot Montana's photograph was not identified by any of the witnesses as one of the perpetrators. Although Montana's nickname, "Manny," could have been confused with defendant Manuel "Sonny" Nelson, Det. Mims testified before the jury that there was another suspect named Elliot Montana. Det. Mims was cross-examined about the police investigation of Montana. There is no possibility that the information from this supplemental report relative to Elliot Montana would have affected the verdict.
As to the third claim under Brady, Nelson argues that Det. Mims "made numerous assertions that no information was gathered when in fact the supplemental reports show consistent conversation with most of the witnesses throughout the investigation." The appellant fails to identify those assertions which allegedly differ from the supplemental reports.
Considering the above, there is no reasonable probability that the evidence which was allegedly withheld from the defense, even considered collectively, would have changed the outcome of the trial. This assignment is without merit.

ASSIGNMENT TWO
Nelson here argues that the trial court erred in denying the motion for mistrial based on a defect in the proceeding. The appellant notes the allegedly "perjured" testimony of Ms. Valerie Robair and the alleged withholding of Brady material, but he argues error only in the denial of a mistrial based on a hearsay reference to prior bad acts. This out-of-court statement was made by defendant Nelson, overheard by witness Mary Jenkins, and retold on the witness stand by Det. Mims. That testimony, at pages 190-191, proceeded as follows:
BY MS. GLASS (ASSISTANT DISTRICT ATTORNEY):
Q. Did you interview Mary Jenkins in connection with the July 16th murder?
A (DET.MIMS). Yes, I did.
Q. Did she indicate to you that she knew the perpetrators?
A. Yes.
Q. Did she indicate to you that she had heard something from one of the perpetrators?
A. Yes.
Q. Who was that?
A. Manuel Nelson.
Q. What did she tell you about that?
MR. DUNN (COUNSEL FOR NELSON):
Objection, Your Honor, as to what she said.
BY THE COURT:

*763 I'm going to overrule that since the lady has testified.
BY MS. GLASS:
Q. What did she (Mary Jenkins) tell you?
A. She informed me that Mr. Nelson was attempting to rob someone and he was bragging about how many people he killed.
At this point, the court warned counsel, but refused to sustain the defense objection. When the prosecutor then attempted to question the officer about only what Ms. Jenkins overheard Mr. Nelson say, the court sustained the objection. Counsel for Nelson moved for a mistrial, which was denied.
As to the hearsay element of the statement, the statement by Nelson relative to his July 16 murder of Peewee Jones was corroborated by other evidence and was therefore admissible as a statement against interest under La. C.E. art. 804(B)(3). Hearsay included within hearsay is admissible if each part of the combined statements conforms with an exception to the hearsay rule. La. C.E. art. 805. When a hearsay statement has been admitted into evidence, the credibility of the declarant may be attacked, and if attacked may be supported. La. C.E. art. 806. The repetition by Det. Mims of declarant Jenkins's statement was admissible to support her credibility, which was attacked relative to an alleged deal with the State for the benefit of Jenkins's son, who had a pending parole violation hearing at the time of the instant trial.
As to the other crimes reference, La. C.Cr.P. art. 770 provides in part that upon the motion of a defendant, the trial court shall grant a mistrial where a judge, district attorney, or other court official refers to "another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible." Art. 771 provides for the mandatory admonition of the jury, upon request of the defendant, in instances listed under art. 770 where the speaker is someone other than a judge, district attorney, or court official. Art. 771 also provides that a trial court may grant a mistrial in such cases where the defendant so moves "if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial."
This reference to other crimes was made by a police officer. A police officer is not considered to be a "court official." See State v. Morgan, 94-2586 (La.App. 4th Cir. 3/14/96), 671 So.2d 998, writ denied, 96-0975 (La.9/27/96), 679 So.2d 1359; State v. Manuel, 94-0087 and 94-0088 (La.App. 4th Cir. 11/30/94), 646 So.2d 489. Nor was the reference solicited by a court official. The prosecutor was entitled to question the officer to support the credibility of witness Mary Jenkins, and her question was not for the purpose of eliciting the reference to other crimes. Accordingly, a mistrial was discretionary with the trial court. The defendant did not request an admonishment. Considering the other evidence, this other crimes reference did not affect the verdict. Any error in the trial court's failure to grant a mistrial was harmless.

ASSIGNMENT THREE
The appellant argues that the trial court improperly allowed victim impact evidence at trial which influenced the jury. The appellant cites to capital sentencing cases which hold that the victim's survivors' opinions are irrelevant. Those cases are clearly inapplicable to the instant case. The appellant is here complaining that the victim's friends and family were permitted to wear t-shirts bearing the victim's picture. The defendant complained at the beginning of trial and the court noted that the spectators wearing the shirts were not readily visible to the jury. The court further requested that the spectators not wander in and out of the courtroom, but rather remain seated, so as to minimize the effect of the t-shirts. The defendant objected again in the middle of trial and the court found the shirts were not inflammatory.
The prosecutor did not put on any evidence relative to victim impact. There is no evidence of any demonstration or outbursts of emotion by the spectators. If anything inflamed the jury, it was the facts of the offenses revealed from the witness stand, not the wearing of t-shirts by some spectators. This assignment is without merit.

*764 ASSIGNMENT FOUR

The appellant avers that the jury erred in finding him guilty of second degree murder based on insufficient evidence. The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
As to the first count, the July 16 murder, Valerie Robair was outside with her four-year-old when she witnessed the shooting. Ms. Robair recognized the perpetrators as individuals she knew by first name from around the project. The number and placement of the gunshot wounds were sufficient for the jury to infer that the defendants intended to kill or commit great bodily harm to the victim. Mary Jenkins testified that she heard defendant Nelson bragging about the murder of Peewee the victim of the July 16 murder.
As to the second count, the July 10 murder, Ms. Robair testified that she was looking out her window when she observed the defendants shoot the victim. Ms. Jenkins testified that she was called to the scene of the July 10 murder when she was told that two men were arguing with her son. She testified that she heard the shots being fired as she got to the scene. She even asked the perpetrators why they were shooting her son. She did not know that the victim was not her son until after the shooting was over and the perpetrators left the scene. Like Ms. Robair, Ms. Jenkins recognized the perpetrators as individuals she knew from around the project. Again, the number and placement of the gunshot wounds were sufficient for the jury to infer that the defendants intended to kill or commit great bodily harm to the victim. Even if Ms. Robair's testimony is compromised by her prior statement, which is questionable considering her admitted fear of retaliation, Ms. Jenkins' identifications and statement were credible.
Neither Jenkins nor Robair knew either victim or had any kind of relationship with the defendants. By contrast, Nelson's girlfriend was his sole alibi witness as to both murders. Peters produced two alibi witnesses for Sunday night, July 10; however, the murder occurred early Sunday morning.
We find the evidence was sufficient for a rational jury to have found the essential elements of the crimes were proven beyond a reasonable doubt.

III. ASSIGNMENT OF ERRORPETERS, PRO SE

In his pro se brief, appellant Peters argues that the State's failure to disclose material evidence favorable to the defense denied him a fair trial in three respects: (1) State witness Valerie Robair committed perjury when she testified falsely and inconsistently with her initial statement noted in the homicide investigation report, and the prosecutor allowed it to go uncorrected; (2) The prosecutor withheld the homicide investigation report which contained exculpatory information in relation to several other people being responsible for the murders; and (3) The prosecutors suppressed information concerning their witness Valerie Robair being unable to identify defendant Lawrence Peters out of a photographic lineup as the person who killed William Henry "Peewee" Jones.
As to the first claim, as previously discussed, the discrepancy between the witness's testimony and her prior statement relative to the July 10 murder may be explained by the fact that she was awakened at 2:30 a.m., almost two weeks after the second murder. The discrepancy may further be explained by the witness's fear of the defendants, which was explored at trial and in great detail in the homicide report. It is further probable that the witness changed her story relative to the July 10 murder prior to the trial. In which case, the prosecutor had no reason to believe that the witness was committing perjury on the witness stand. Although the defendants should have been provided with the report or otherwise advised of this discrepancy, it is unlikely that providing this information to the defense would have affected the verdict.
*765 As to the second claim, the supplemental homicide reports contain the names of various individuals who were rumored to have committed the murders. The eyewitnesses did not identify these individuals in photographic lineups. Accordingly, this information was not exculpatory. Moreover, the eyewitnesses testified to recognizing the perpetrators. Accordingly, a misidentification is unlikely.
As to the third claim, Peters avers that the information that Valerie Robair never identified him in a photographic lineup was exculpatory. The supplemental homicide report explained that Ms. Robair was presented with a photograph lineup which contained a photograph of defendant Nelson, which Robair picked out but refused to sign. Ms. Robair was never presented with a photographic lineup containing a photograph of defendant Peters. According to the supplemental report, Ms. Robair paged the investigating officer on at least four occasions when she observed the suspect, known to her only as Lawrence, and provided a location and description so that the arrest could be made. Following the arrest, a photographic lineup containing a photograph of defendant Lawrence Peters was shown to Mary Jenkins, who positively identified Peters as the other perpetrator. This evidence was not exculpatory.
Even if this non-identification were exculpatory, it was revealed during trial. Det. Mims testified that Ms. Robair never identified defendant Peters from a photographic lineup, but rather observed him on the street and notified the police so that he could be arrested. Thus, the defendant was not prejudiced, because this information was brought to the attention of the jury at trial.
As previously noted, under Kyles, evidence which is allegedly withheld must be considered collectively to determine whether the "materiality" requirement of a Brady violation has been satisfied. However, the only favorable evidence allegedly withheld in this case is the prior statement by Ms. Robair relative to the July 10 murder. There is no reasonable probability that withholding this information affected the verdict. This assignment is without merit.

IV. PATENT ERROR REVIEW/ASSIGNMENT BY COUNSEL FOR PETERS

As his sole assignment of error, counsel for Peters requests a review of the record for errors patent. Counsel complied with the procedures outlined by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted by this Court in State v. Benjamin, 573 So.2d 528 (La.App. 4th Cir.1990). Counsel's detailed review of the procedural history of the case and the facts of the case indicate a thorough review of the record. Counsel has moved to withdraw because he believes, after a conscientious review of the record, there are no non-frivolous issues to be raised on appeal. Counsel has reviewed all available transcripts and has found no trial court rulings which arguably support the appeal. This court notified the defendant he would be allowed to file his own brief. Peters filed a brief assigning an error, which was discussed above and found to be without merit. As per Benjamin, this Court has performed an independent, thorough review of all the pleadings filed in the district court which are in the appeal record, all minute entries of the district court proceedings, the bill of indictment, and all transcripts contained in the appeal record as to both appellants. The appellants were properly charged by bill of indictment with two counts of second degree murder, violations of La. R.S. 14:30.1, and the bill was signed by the foreman of the grand jury. The appellants were present and represented by counsel at arraignment, all hearings, and sentencing. The evidence adduced at trial was sufficient to support the appellants' convictions of guilty as charged. The concurrent sentences of life imprisonment without benefit of parole are legal in all respects. A review of the record reveals no errors patent, and an independent review of the transcripts contained in the appeal record reveals no trial court ruling which arguably supports the appeal.
Accordingly, the convictions and sentences of defendants Manuel I. Nelson and Lawrence Peters are hereby affirmed. Counsel's motion to withdraw is granted.
*766 AFFIRMED. MOTION TO WITHDRAW GRANTED.