CARAWAY, J.
hNykeshun Nealon was charged by bill of information with armed robbery and conspiracy to commit armed robbery. Following a jury trial, Nealon was . found guilty as charged on both counts. The trial court sentenced Nealon to concurrent sentences of 35 years at hard labor for the armed robbery conviction and 15’years at hard' labor for the conspiracy conviction. Nealon appeals urging insufficient evidence to convict and excessiveness of the imposed sentences. We affirm.

Facts

Upon his return home from his job as an assistant manager with the Rayville Wal-Mart, shortly before 11:00 on the evening of December 1, 2012, Joshua Bray heard rustling noises as he parked his truck in his garage and exited his vehicle. Shortly thereafter,. three armed and masked men approached Bray. Bray recalled that one of the men wore a gorilla mask, one a red mask and the third had on a bandanna. Bray could see that the man who wore the bandanna was black.
Upon the men’s approach, Bray fell to the ground screaming. The man in the gorilla mask told him to “shut up,” and threatened to kill Bray, demanding that he *665 take the men into his home. Bray heard the voices of all three men during the encounter but recalled that the man in the gorilla mask “talked a lot.”
After the men entered Bray’s home, he was thrown on the floor of his bedroom and questioned about a safe at Wal-Mart by the man who wore the gorilla mask. That man had at one point grabbed Bray’s employee badge hand made it clear that he was referring to the safe at Wal-Mart. The men never asked about the location of the safe in the store. Fearing that others would be harmed, Bray offered to retrieve money from the safe for the men. The man in the gorilla mask told Bray he could get into the safe if he desired,
The men asked Bray for a combination to the safe and threatened to kill him if he lied. They tied Bray’s hands behind his back and draped a pillowcase over his face while pointing a gun to his temple. At the point when Bray informed the men that the safe was a combination safe, one of the men struck him in the head and he began to bleed; Bray thought that he had been shot. One of the men also yelled at the victim, demanding the safe combination. Bray “rattled off numbers,” but was so scared that he did not know if they were right; in fact one of the men commented that the combination did not sound right.
Prior, to their leaving, the men tied Bray’s ankles with zip ties that. Bray recognized as being similar to those used at Wal-Mart and given to employees for use in the store. They also gagged him with a sock and tied a belt around his mouth, leaving him on the floor. The men left,, but not before taking Bray’s cell phone, personal and work keys, wallet, shotgun and truck. Bray heard the man in the gorilla mask talk about looking up Bray’s father’s telephone number on the cell phone and threatening to kill him. Bray also recalled that the man in the gorilla mask instructed one of the men to stay behind and “watch” him, but Bray listened for a little bit and determined that all three had left. He was able to free himself and run to his [¡¿neighbor's house where police were called; Bray suffered both a broken nose and eye socket for which he received medical treatment.
Upon questioning Bray, police learned that he had recently fired Nykeshun Neal-on from.his cashier’s job at Wal-Mart. The discovery of Bray’s truck at 3:00 a.m. the following morning, about ,6 mile from Bray’s home in elqse proximity to Nealon’s parents’ home, led police to .further investigate Nealon. Nealon’s parents gave their son’s address to police who went to the location. Nealon told police he had been out. for the evening in his girlfriend’s car and denied being involved in the robbery. During a plain view search of the vehicle, police saw a brown jacket on the back seat of the car which matched the description of a jacket Bray indicated was in his truck. Later, Nealon’s girlfriend gave police consent to search the vehicle and Bray ultimately identified the jacket as his. Police arrested Nealon in the early morning hours of December 2,2012.
On January 30, 2018, ; Nealon was charged by bill of information with armed robbery and conspiracy to commit armed robbery. By an Í1-1 jury vote, Nealon was convicted as charged. He was sentenced to concurrent sentences of 35, years for the armed robbery and 15 years for the conspiracy conviction. After a timely motion to reconsider sentence was denied by. the trial court, this appeal ensued.

Discussion

In his first assignment of error, Nealon argues that the evidence submitted by the state was insufficient to convict him of the charged offenses and that the imposed sentences were unconstitutionally excessive ^considering his lack of a previ *666 ous criminal record. Specifically, Nealon contends that the state provided no witness, fingerprint or DNA evidence to place him at the scene of the crime, no evidence showing that someone other than Nealon placed' the jacket in the car, and utilized the fabricated testimony of an inmate to implicate him in the crimes.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), appellate courts review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La.C.Cr.P. art. 821, 'does' not provide the appellate court with a vehicle to substitute its own appréciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct, evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt Uthat the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, writ denied, 07-2053 (La.3/7/08), 977 So.2d 896; State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id.
When the conviction is based on circumstantial evidence, such evidence must exclude any reasonable hypothesis of innocence. La. R.S. 15:438; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This evidentiary rule restrains the factfinder in the first instance, and the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Young, 618 So.2d 1149 (La.App. 2d Cir.1993).
The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Calloway, 07-2306 (La.1/21/09), 1 So.3d 417.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the ^witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, units denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d *667 90 (2004). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. Credibility determinations are the province of the trier of fact. State v. Johnson, 38,927 (La.App.2d Cir.11/23/04), 887 So.2d 751; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
A reviewing court accords great deference to a jury’s decision, to accept or reject the testimony of a witness in whole or m part. State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process -of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
A jury’s decision to accept the testimony of a defendant’s cellmate is afforded due deference and there is no blanket exclusion of jailhouse witness testimony. Robinson, supra. La. C.E. art. 601 establishes the general rule that every person of proper understanding is competent to be a witness except as otherwise provided by legislation. Likewise, a witness may testify to a matter based on personal knowledge in accordance with La. C.E. art. 602. Id.
17Furthermore, when the key issue is the - defendant’s identity as the perpetrator, rather than whether, the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047. Positive identification by only one witness- is sufficient to support a conviction. Id. It is the factfinder who weighs the respective credibility of the witnesses, and this court will generally not second-guess those determinations. Id.
Armed' robbery is defined in La. R.S. 14:64, as follows:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
The definition for criminal conspiracy is •found in La. R.S. 14:26(A), where it is defined as follows:
Criminal conspiracy is the agreement or combination of two - or more persons for the specific purpose of committing any crime; provided that an. agreement. or combination to commit a crime shall not amount to a criminal conspiracy unless, in, addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
To convict a defendant of armed robbery, the state is required to prove: (1) a-taking (2) of anything of value (3) from the person or in the immediate control-of another (4) by the use of force of intimidation© while arrhed with a dangerous weapon. State v. Clark, 47,424 (La.App.2d Cir.10/3/12); 107 So.3d 644, writ denied, 12-2595 (La.5/3/13), 113 So.3d 210; State v. Williams 45,755 (La.App.2d Cir.11/3/10), 54 So.3d 1129; State v. Jeselink, 35,189 (La.App.2d Cir.10/31/01), 799 So.2d 684.
For purposes of the crime of conspiracy, specific intent may be inferred from the circumstances of the transaction and actions- of the defendant. State v. Broussard, 49,240 (La.App.2d Cir.10/1/14), 149 So.3d 446. Elements of conspiracy may be proven by direct or circumstantial evidence. State v. Davis, 12-512 (La.App. 5th Cir.4/24/13), 115 So.3d 68, writ denied, *668 13-1205 (La.11/22/13), 126 So.3d 479. The overt act need not be unlawful; it may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance , of the object of the agreement. Broussard, supra.
At the trial of this matter, the following facts were gleaned from the witnesses’ testimony.
Joshua Bray, the victim in this case, was the state’s first’ witness. Bray testified that at his employment with Wal-Mart, he was acquainted with Nealon, who was a cashier at the same store.' Bray did not interact often with Nealon, but was familiar with him. While he was not overly familiar with- Nealon’s voice, he could identify him by the way he handled himself and the articulate way in which he spoke. Bray testified’ that as a cashier, Nealon would hot have had much reason to have zip ties that Wal-Mart authorized its associates to use. Bray stated that typically at the end of- the day, a cashier helps a customer service manager pull money from the registers and put it into the safe room. Bray.explained that the safe room or cash office is the place where the safe is kept. Cashiers -are not generally 1 nallowed inside the cash office but are aware, of its location and help transport the bags of money there by cart. According to Bray, the location of the safe and safe room is generally common’knowledge among employees.
Bray stated that on November 29, 2012, he addressed an .employment issue with Nealon after receiving information that Nealon cursed at another employee, making her uncomfortable. According to Bray, Nealon admitted the incident. Bray considered Nealon’s disciplinary history with Wal-Mart and subsequently terminated Nealon’s employment. Nealon did not react, but simply walked Out.
. On the evening in question, Bray described his encounter with the three men as noted above. He additionally testified that he worked at Wal-Mart that day from noon -until approximately 10:30 p.m. or. 10:46 p;m. Upon leaving work, he drove his .2005 white, Chevy Silverado truck to his home on Highway 80, some five to eight minutes away. Bray arrived home between 10:50 and 11:00 p.m., parked his truck in the garage and exited his vehicle. Assuming it was an animal, Bray did not think much of the noises. Shortly thereafter, the three armed men approached Bray. He recalled that all three men wore gloves and hoodies and that one was a black man. He could- not- see whether the other men were white or black, but believed-the other-two spoke as if they were also black men. The man in the gorilla mask, who spoke more than the others, told him, “Shut the f— up or I’ll 'f— kill you!” Bray recalled that the man in the gorilla mask appeared to be about the samé height and body build as Nealon.
| ipBray specifically recalled that the men asked whether the safe was a thumbprint safe. Bray’s keys, wallet and cell phone were taken out of his pockets. Bray also observed later that the men had taken his dad’s .410 shotgun out of the back bedroom of his home. He testified that he had no zip ties in his house before the robbery occurred.
Sometime following the incident, Bray spoke with Investigator Richard Rockett from the Richland Parish Sheriff’s Office. When Rockett inquired as to who Bray may have fired recently, Bray began to suspect Nykeshun Nealon as one of the persons who attacked him at his home. He described the assailant in the gorilla mask as articulate and having a- similar build to Nealon. None of the men fit the description of another individual Bray had recently fired. Additionally, throughout *669 the investigation, Bray mentioned that he left a brown jacket inside his truck as well as other items.[1] He described the jacket as having a buffalo label on the, back and front, and a cut on one of the pockets near another pocket that had been stitched, with different colored threading from the remainder of the jacket. Bray identified in open court the brown jacket found in Neal-on’s girlfriend's vehicle. He was “100% sure” that the jacket was his and that prior to the robbery, it was in his truck. Bray testified that the .410 shotgun and his wallet were eventually recovered, although the wallet was missing cash. ’
Investigator Richard Owen Rockett testified next. On December 1, 2012, Rockett worked for the Richland Parish Sheriffs Department as a criminal investigator when he became involved in the armed robbery Ininvestigation involving Bray. Rockétt received a call at approximately 11:00 p.m. about a crime in Rayville on Highway 80. When Rockett arrived, Bray had already been transported to the hospital. ■
When Rockett spoke with Bray at the hospital, Bray described the incident. Rockett also asked Bray about people with whom he might have problems. According to Rockett, Bray “referenced Wal-Mart so many times.” Because the suspects also mentioned the store during the crime, it “clicked in my head that might have a connection.” He began to question Bray about his relationships at Wal-Mart, including his firing of Nealon.
After leaving the hospital, Rockett continued his investigation. Attempts were made to locate Bray’s truck and cell phone. Investigators were unable to locate the cell phone, but found the truck at 3:50 a,m. on December 2, a few hundred yards from Nealon’s parents’ home, less than a mile from Bray’s home. The keys and shotgun were in the vehicle.
Rockett went to Nealon’s parents’ home and asked to speak with Nealon. Upon discovering that Nealon lived elsewhere, Rockett traveled to the residence of Neal-on’s girlfriend, Novelette Dorsey. Rockett testified that the house was located approximately 10 minutes from the location of the truck.' He took Nealon in for questioning, informing him of his rights at approximately 4:57 a.m. According to Rock-ett, Nealon admitted to knowing Bray, where he lived, and what type of vehicle he drove,' Nealon denied any involvement with the crime and provided an alibi. .He stated that he was out on that evening with a friend until approximately 11:00 p.m. or 12:00 a.m. He admitted to driving Dorsey’s vehicle, a gray Altima;
hi,After Rockett concluded his interview, he went back to the Dorsey sisters’ residence and requested permission to search the home. Permission was granted and Rockett located only a plastic mask at an unspecified location in the home. Rockett also looked'inside Dorsey’s vehicle with a flashlight and observed a brown jacket on the passenger side of the back seat in plain view. At that time, Rockett had no knowledge that the brown jacket was related to the armed robbery, although he, knew that a pile of clothes was found in the back seat of Bray’s truck.
Rockett testified that he went back to Bray’s parents’ house to update them. It was then that he learned from Bray that he had a brown jacket located inside' his truck at the time of the armed robbery, Because Rockett remembered the brown jacket in Dorsey’s vehicle, he contacted *670 her at work at the Bastrop Wal-Mart and asked her if the jacket belonged to either her or Nealon. Dorsey told him that it did not. She also indicated to Rockett that the jacket was still in the car. Dorsey gave consent to search her vehicle and Rockett retrieved the jacket, which he identified in court. He took the jacket to Bray, who identified it as being his.
Rockett testified that no DNA or fingerprints were found in the truck to connect Nealon to the crime; he testified that this may not be unusual considering the suspects wore gloves and masks. Rockett did not investigate the other two individuals that Bray had .fired because of his discovery of Bray’s jacket in a car that Nealon had driven on the night of the crime.
11sRockett further testified that he had contacted jail personnel to obtain recordings of Nealon’s jail calls. Rockett located recorded calls Nealon made. In one phone call on. December 3 to Dorsey, Nealon provided phone numbers and instructions for Dorsey to call the “Baker Boys,” and family .members to tell them not to say anything. In a second phone call, Nealon made similar statements to his mother. Rockett identified the phone recordings admitted into evidence. He testified that he listened to the recordings and was able to authenticate them as being from the Richland Parish Detention. Center and from Nealon to Dorsey and his mother. The recordings were also played for the jury which was provided a transcript of the conversations.
Rockett confirmed that the phone numbers mentioned by Nealon in the recordings belonged to Corey Banks, a cousin of Nealon, and Elanzer Nealon, Nealon’s brother. Rockett spoke with Banks but was never able to meet him to talk. Rock-ett was never able to determine who the Baker boys were. Rockett obtained a search warrant for Dorsey’s telephone records and determined that she made contact with one of the phone numbers belonging to Corey Banks on December 3, 2012. Those records were admitted into evidence.
On cross-examination, Rockett admitted that someone other than Nealon could have used Dorsey’s vehicle after midnight when Nealon claimed that he returned home. Rockett also testified that upon his attempts to interview Elanzer Nealon, Nealon’s brother, he realized “that family was not going to be very cooperative in my investigation” and he never |interviewed him. Rockett also testified that he did not know when the coat was placed in Dorsey’s vehicle.
Dorsey testified that she is currently living with Nealon’s mother and is the mother of Nealon’s two children. She stated that in 2012, she lived at 105 Black-mon with her sister, daughter and Nealon. In 2012, Dorsey owned a gray 2008 Nissan Altjma. Dorsey testified, that Nealon did not own a vehicle and would use her vehicle for transportation, against her mother’s wishes. According to Dorsey, on the evening in question, Nealon left the home about 8:30 p.m. and did not inform her where he was going. Dorsey and her daughter went to bed around 10:30 or 11:00 p.m. At that timé, Nealon was not home. Dorsey did not see Nealon again until 3:00 a,m. when she got up to get'her hair done by her sister. She did not know when Nealon came in. Dorsey explained that it was a long process to get her hair done, so she woke up early to complete a portion, of it before she went to work. Dorsey testified that her keys were in their usual location when she needed her car the following day for work. She stated that no one other than Nealon used her car that evening; she did not give anybody else permission to use the vehicle and nobody would have been able to use her car *671 between 12:00 and'3:00 a.m. Dorsey testified that nobody came to her house in the early morning hours to return her keys.
Dorsey testified that a couple,of days after the crime, Rockett contacted her about a brown jacket allegedly inside her vehicle. She was unaware, that a jacket was inside her vehicle and. there was no reason that a jacket should have bee.n there. She had driven the.car and never noticed the bracket in the back seat, probably because she did not take her baby with her that morning and did not look in the back seat of the car. Dorsey .confirmed that a brown leather jacket that she had never seen was located in her vehicle. She knew that the coat was not Nealon’s.
Lastly, Dorséy téstified that in' the recorded phone call she had with Nealon while he was incarcerated, she was instructed to call “Elanzer and C.J.” She admitted to calling the, numbers mentioned in the recorded conversation. Dorsey was later charged with accessory after the. fact to armed robbery. She testified that police found nothing in the house connected to an armed robbery after the search of the home.
Monterous Smith testified that he had known Nealon approximately two years. Smith was currently housed in the Rich-land Parish Detention Center for‘a pending possession of cocaine charge. He had previously been convicted of simple robbery and misrepresentation of drug distribution or pretending to sell drugs. Smith testified that he had been housed in the same dormitory as Nealon at the Richland Parish Detention Center for approximately two months. He stated that their bunks were side by side. During the two months that Smith and Nealon resided in close proximity, Smith testified that “I had just heard him say that he had got fired and he was going out for revenge and went at the man and beat him and tried to get the combination code.” Smith allegedly heard this in both the dormitory and in- church when he was “right close to him.” According to Smith, Nealon was speaking to an individual named Marvin Wilson[2] while at the 11 r,church and another inmate while in the dormitory, when Smith overheard the above statements. Smith also overheard Nealon admit that someone “close to him” was involved in the incident, and that he “wasn’t sending him no money,” and “couldn’t believe they’d turned their back on him.”
Smith admitted that he was approached by authorities and had revealed this information to them only “a couple of weeks ago.” The state rested upon conclusion of Smith’s testimony and the defense rested without calling any witnesses.
When viewed in the light most favorable to the state, we find the evidence sufficient to convict Nealon of armed robbery and conspiracy to commit armed robbery.
The evidence clearly established that an armed robbery occurred. Bray’s description of the events established that he was threatened with his life at gunpoint and pistol whipped by the perpetrators, who were lying in wait for him. The three men absconded with his truck, a gun from his bedroom and wallet and cell phone from his person. They also gagged Bray with a sock and tied a belt around his mouth, tied him up with zip ties and threatened to harm his father. This evidence satisfied each element of armed robbery as noted above.
Nealon’s identity as a participant in the armed robbery and conspiracy was also sufficiently established by both the direct and circumstantial evidence. Smith testi *672 fied that he heard Nealon admit to committing the crime with someone close to him' because he was fired, angry and sought revenge. Ultimately the jury deemed credible Smith’s testimony that Indirectly implicated- Nealon in the robbery. That testimony, along with Bray’s eyewitness account of the trio’s pre-crime actions in waiting for and ambushing him, also reasonably created an inference that the three combined and agreed to participate in a revenge plan to rob Bray.
Other evidence corroborated Nealon’s participation in the crimes. Most important was the discovery of Bray’s -stolen jacket in a car that Nealon had admittedly driven .on the night of the crime and returned home in between 11:00 p.m. and midnight. ..Dorsey corroborated the fact that Nealon was not home around 11:00 p.m., the time of the crime. Her testimony also established that the.individual who returned the keys knew to place them in their usual location. From this evidence, the jury could have reasonably found that it was Nealon who had last driven the car and placed the keys in the familiar location upon his return home after committing the crime. Moreover, considering the established time frame and sequence of events, the jury could have also reasonably rejected the theory that a third party drove the car after Nealon’s return home and randomly placed Bray’s jacket in Dorsey’s vehicle in the hours after the robbery had occurred. Certainly Nealon’s directions to his. girlfriend and mother to tell family members and others .to keep silent, was also evidence from which the jury could have inferred Nealon’s guilt by participation in the robbery and agreement to commit the robbery with other men, possibly his relatives.
Finally, Bray testified that the man in the gorilla mask fit Nealon's description. The perpetrators’ ambush and specific demand for a combination to a Wal-Mart safe circumstantially connected Nealon to the lacrime because Bray had fired him from a job ’that would have given him knowledge and access to Wal-Mart zip ties and information about the location of the safe room. Nealon knew Bray, where he lived, and what type of vehicle he drove. Bray’s white .2005 Chevy Silverado truck was found only a few hundred yards from Nealon’s parents’ home and less than a mile from Bray’s home.
The totality of this evidence supports the jury verdicts. We. find'no merit to Nealon’s argument.

Excessive Sentence ,

In his second assignment of error, Nealon contends that the imposed sentences for a first-time felon are substantially unreasonable and excessive considering the weak facts of the case and the State’s failure to' prove he committed the crime. Nealon argues that he is nonviolent, has no criminal history, and is a productive citizen and provider for his family;
Á sentencing hearing was held on September 24, 2014. , The trial court considered the facts contained in the presentence investigation report that included Nealon’s age (26 years old), social history and lack of a criminal history, with the exception of a pending charge in. Mississippi that the trial court did not use in consideration of sentencing. The court considered statements made by the. victim[3] and Nealon.
*673 The trial court also received a statement from Nealon’s pastor, reflecting Nealon as a decent, respectful young man but noted the sheriff’s ^recommendation for the maximum sentence due to the seriousness of the offense. The judge considered many letters, both for and against. Nealon, The eourt noted that while many members of the community described Nealon as a decent, hardworking,- church member, loved by all, nevertheless a “stack of letters” indicated that Nealon “basically ruined a man’s life.” Specifically, the court noted the letters sent by Bray’s family describing what happened to him as “very traumatic.”
The trial court considered the facts of the crime and indicated that Nealon’s'ac-tions robbed Bray of the security of his home. The court observed that this crime was particularly violent. After specifically noting its consideration of all of the La. C.Cr.P. art. 894.1 factors, the court imposed concurrent sentences of 35 years for armed robbery and 15 years for conspiracy to commit armed robbery, reasoning that any lesser sentences would deprecate the seriousness of the offense based on the facts surrounding this specific offense.
The sentencing range for armed robbery is hard labor for not less than 10 years and not more than 99 years, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:64. ■
Whoever is a party to a criminal conspiracy to commit any other crime shall- be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both. La. R.S. 14:26.
lanAppellate review of " sentences for excessiveness is a two-pronged inquiry. First, the record must show-that the sentencing court complied with La. C.Cr.P. art. 894.1/ The court need not list every aggravating or mitigating factor so long as the record- reflects that it adequately considered the guidelines. State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819; State v. Linneair, 44,830 (La.App.2d Cir.12/9/09), 26 So.3d 303. When the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of Ml compliance with the article. State v. Lobato, 603 So.2d 739 (La.1992); Linnear, supra. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Taves, 03-0518 (La.12/3/03), 861 So.2d 144; State v. Caldwell, 46,718 (La.App.2d Cir.11/2/11), 78 So.3d 799.
Second, a sentence violates La. Const, art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166.
|21The trial court is given wide discretion in the imposition of sentences within the statutory limits. The sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams, 03-3514 (La.12/13/04), *674 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Díaz, 46,750 (La.App.2d Cir.12/14/11), 81 So.3d 228. On' review, an appellate court does not determine whether another sentence may have been more appropriate; but whether the trial court abused its discretion. Williams, supra; State v. Free, 46,-894 (La.App.2d Cir.1/25/12), 86 So.3d 29.
A sentence may violate a defendant’s" constitutional right against excessive punishment even if it is within the statutory limit. Marshall, supra. To determine whether a particular sentence is excessive, this court must decide whether it is so disproportionate to the severity of the crime as to shock the sense of justice. Id.
Although Nealon does, not raise this issue on appeal,’we find adequate La.C.Cr.P. art. 894.1 compliance by the trial court. We also find that the imposed sentences to be adequately tailored to this defendant and the circumstances of the crime. For both offenses, Nealon faced potential maximum sentencing exposure of 99 years at hard labor for the armed robbery conviction and half of that for the conspiracy conviction. Thus,, each imposed sentence was in the lower half of Nealon’s potential sentencing exposure range. The evidence, shows that this.brutal attack was rooted in anger and revenge for Nealon’s firing. He enlisted the aid of two other men to carry out the revenge robbery of this specific victim. This | gacrime was particularly violent and. Bray suffered both physically and emotionally. He has experienced fear, an-, ger and paranoia, immediately moved out of his home after the robbery and has changed jobs. Bray incurred serious and painful injuries to his eye and nose and has had trouble sleeping since being victimized. Some of the items stolen were never returned. Under these circumstances, we agree with the trial court that any lesser sentences would deprecate the seriousness of the offenses. This assignment of error is without merit.

Error Patent

, Our review of the appellate record discloses that the trial court improperly informed Nealon that he had two years from the date his “sentence” became final to assert any claim for post conviction relief. No application for post conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment, of “conviction and sentence” has .become final under the provisions of . La. C.Cr.P. arts. 914 or 922. This error is not grounds to vacate the sentence and remand for resentencing. State v. Baker, 49,175 (La.App.2d Cir.8/27/14), 148 So.3d 217. This court hereby notifies Nealon that he has two .years from the date his convictions and sentences become final under La.C.Cr.P. art., 914 or 922 to file any applications for post conviction relief. State v. Parker, 49,009 (La.App.2d Cir.5/15/14), 141 So.3d 839.[4]

IanDecree

For the foregoing reasons, Nealon’s convictions and sentences aré affirmed.
AFFIRMED.

. Bray had done laundry at his parents’ home the previous day and left his laundry in the truck, including the brown jacket.

. Marvin Wilson was called by the state but refused to testify.

. Bray informed the judge by letter that this crime has affected him greatly. He noted ho suffered two physical injuries and moved out of his home to a more expensive apartment to feel safer the day after the incident. The incident caused Bray to suffer anger issues, fear and paranoia.

. We note that the trial court failed to impose the sentences without benefits as required by La. R.S. 14:64 and 14:26. Such error will be corrected automatically by operation of La. R.S. 15:301.1. State v. Williams, 00-1725 (La. 11/28/01), 800 So.2d 790; State v. Braziel, 42,668 (La.App.2d Cir. 10/24/07), 968 So.2d 853.